Janeen Carlberg (CA SBN 189197)
jcarlberg@lawfirmoc.com
Lizeth Perales (CA SBN 325498)
info@oceralaw.com
Law Offices of Janeen Carlberg
1912 N. Broadway, Suite 106
Santa Ana, CA 92706
(714) 665-1900

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB KNIGHT, JACK CRIBBS, and JASON DOHSE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WATA, INC., and COLLECTORS UNIVERSE, INC.,<br><br>Defendants. | Case No.: 8:22-cv-00967-DOC-(KESx)<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>[DEMAND FOR JURY TRIAL; VENUE AFFIDAVITS] |

## I.      INTRODUCTION.

1.      The claims asserted in this Complaint are as follows: 1) RICO (18 U.S.C. § 1962(c)); 2) Unfair Competition Law (Cal. Bus. & Prof. §17200); 3) False Advertising (Cal. Bus. & Prof. §17500); 4) Intentional Misrepresentation; 5) Nondisclosure; and 6) Consumers Legal Remedies Act (Cal. Civ. Code §1770).

2.      Plaintiffs, individually and on behalf of all others similarly situated, bring this action based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, inter alia, the investigations of their attorneys.

3.      This case involves video game grading company Wata, Inc. and its parent company, Collector's Universe, Inc., engaging in affirmative acts to manipulate the retro video game market, engaging in unfair business practices, engaging in false advertising, making false statements about the turnaround times for grading services and failing to disclose material delays to customers.

4.      Plaintiffs and class members are consumers across the United States who paid for video game encapsulation and grading services from Defendant Wata, Inc. (hereinafter "Wata") and Collector's Universe, Inc. (hereinafter "CU").

5.      Plaintiffs, individually and on behalf of all other similarly situated, brings this action against Wata and CU to seek recompense for themselves and all class members.

FIRST AMENDED CLASS ACTION COMPLAINT – PAGE 2

6.     Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs and successors, assigns, principals, trustees, sureties, subrogates, representatives and insurers of Defendants.

## II.     JURISDICTION AND VENUE.

7.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964. In addition, this Court has federal question jurisdiction under 28 U.S.C. § 1331 in that Plaintiffs have alleged the violation of a federal statute (civil RICO).

8.     The Court has subject matter jurisdiction over the state law claims alleged in this Complaint pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2)(A) because: (i) the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs; (ii) some of the class members are citizens of a state that is different from the citizenship of Defendants; and (iii) the number of class members is greater than 100. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

9.     The Court has personal jurisdiction of Defendants Wata and CU because Plaintiff's claims arise out of the business activities of Defendants, some of which were conducted in the State of California. From the time Wata began offering video game grading and encapsulation services to the public until the

present, Wata has maintained a website accessible to California consumers, solicited customers in the State of California, has entered into business transactions with California customers, performed services for California customers, shipped items to California customers otherwise conducted business activities in California. Wata also attended retro gaming conventions and events in California, such as Retro City Festival in Pomona in 2019, and advertised its services to consumers at such events. Additionally, in 2021 CU, a company with its principal place of business in Santa Ana, California, purchased Wata. In 2021, Wata's operations began to be relocated to Santa Ana, California. By 2022, both Wata and CU were both residing and operating in Santa Ana, California.

10.    Venue is proper in the Central District of California because, pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, Defendants' principal place of business is in the Central District of California. Additionally, Defendants conduct a significant amount of business in the Central District and Defendants have substantial contacts in the Central District. Moreover, false advertising, unfair business practices and fraudulent conduct occurred in the Central District.

## III.    PARTIES.

11.    Plaintiff Jacob Knight ("Knight") is a video game collector and Wata customer who resides in California. Knight purchased Wata's encapsulation and grading services.

12.     Plaintiff Jack Cribbs ("Cribbs") is a video game collector and Wata customer who resides in Michigan. Cribbs purchased Wata's encapsulation and grading services.

13.     Plaintiff Jason Dohse ("Dohse") is a video game collector and Wata customer who resides in Iowa. Dohse purchased Wata's encapsulation and grading services.

14.     Defendant Wata, Inc. ("Wata") is a Colorado corporation. From its inception in 2017 until about September of 2021, Wata maintained its principal place of operations in Denver, Colorado. In or around July of 2021, Wata was purchased by Defendant CU. By September of 2021, operations were being relocated to Santa Ana, California.

15.     By the beginning of 2022, the majority of Wata's operations were occurring in Santa Ana, California. However, as of the filing of this Complaint, there appears to be no Statement of Information filed for Wata with the California Secretary of State.

16.     Defendant Collector's Universe, Inc. ("CU") is a Delaware corporation, with its principal place of business in Santa Ana, California.

IV.     **ALLEGATIONS RELATING TO DEFENDANTS.**

A.     **RETRO VIDEO GAME COLLECTING.**

17.     The collecting, chronicling and preserving of home console video games, hardware and related memorabilia is a widely enjoyed mainstream hobby. In this context, collecting retro video games refers to interactive entertainment that were released on physical media, such as cartridges, cassettes, discs or dvds. There are numerous different home console systems made by such companies as Sony (Playstation), Microsoft (Xbox) and Nintendo which exist to facilitate the playing of such video games. Over the years, retro video games have become collectible, much like comic books, sports trading cards, coins or postage stamps.

18.     Retro video game collecting is a diverse hobby fueled by many different types of individuals, including archivists, historians, preservationists, speculators, resellers and those who simply enjoy collecting physical video games.

19.     As is the case in other collecting hobbies, there are numerous different types of businesses that provide services to collectors. For example, some companies make display pieces to help collector's stage or store their items. Other companies provide online price trackers which accumulate sales data of video game from eBay and other sources. Still other companies provide "grading" services, which involves having an expert inspect and issue a grade to a video game before encasing the game to preserve it in graded form. Just as a comic book collector or coin collector can send an item to be reviewed, inspected, rated by an expert, and encased, physical video games can also be sent it for grading.

20.     There are multiple service providers who grade video games. One of the largest grading companies is now Wata. In 2017, Wata came into existence. It is estimated that Wata began grading games in about 2018.

## B.     GENERAL BACKGROUND ABOUT WATA.

21.     Deniz Khan is the President and Co-Founder of Wata. Kenneth Thrower is the Chief Grader and Co-Founder of Wata.

22.     Wata makes money by charging customers for grading and encapsulation services. The prices for services vary depending on how quickly a customer wants the game back and the value of the game. If the customer wants the game returned quickly, prices are higher. If the value of the game is higher, the price for grading it is also higher.

23.     To explain Wata's pricing, it is important to understand some basics about video game collecting. For purposes of grading collectible video games, games largely exist in one of three states:  1) Sealed or New In Box ("sealed" or "NIB"); 2) Complete In Box ("CIB"); or 3) "Loose." "Sealed" video games are games that have never been opened from the original packaging. These are often the most valuable and expensive type of video game to collect. Definitions of "CIB" vary somewhat, but for the most part, CIB video games are games that have had the outer packaging (often cellphone or shrinkwrap) opened, but still have the original manufacturers' box or case, the accompanying game manual and art

inserts (such as posters or foldouts) and the physical game media (such as a game cartridge or disc). "Loose" video games consist of the physical media only, such as a cartridge or disc. Recently, sealed games are the type of games most often sent in by collectors for grading, although CIB and Loose games are sent in too.

24.     Grading a video game involves a particular process. First, an individual goes to the Wata website, enters information about a particular game and purchases a tier of grading service depending on the turnaround time to receive the fully graded game back. Next, the video game is shipped to Wata. Then, the game is inspected and graded by Wata. When grading video games, Wata uses a 10.0 scale, with a 10.0 being an absolutely pristine example of a video game with no flaws. When a video game is sealed, the outer packaging, which is often the cellphone covering, is graded on a separate scale with A++ being the highest possible rating and going down to a C. Other grading service providers use different metrics, but these are the scales used by Wata. The game is then encased, or "encapsulated," in clear plastic case. As Wata uses the term "encapsulation," that term will be used here. Wata's encapsulation contains some basic information on the encapsulation which includes, at least, the name of the game and the grade or grades given. Finally, the game is sent back to the customer in its new form.

25.     Wata sells consumers both goods and services. The goods are the actual "encapsulation" products that are used to protect the video game. The

services are the grading of the video games. For purposes of this Complaint "grading services" is intended to mean both the "goods" and the "services" components of a consumer's transaction between Wata and its customers.

26.     Wata offers different prices for grading services depending on the value of the game, the state of the game (sealed, CIB, or Loose) and the speed of the grading service ordered, although prices have changed by Wata over time. Presently, the minimum price for grading a game is $60. However, because Wata's pricing involves charging a percentage of a game's market value, if a game's value is higher, the price is higher. For example, if a game's market value is $20,000, Wata will charge approximately $480 to grade it. If a game's value is even higher, the price for grading services will increase as well. It should also be noted that grading CIB games costs more than sealed games on average, presumably because the contents have to be separately inspected, authenticated and graded. Finally, faster service costs more money than slower service. Presently, the minimum charge for a one hundred fifty (150) business day turnaround is $60, but an order for an eighteen (18) day business turnaround costs a minimum of $125.

27.     Currently, Wata's website offers the following information about its service tiers:

| | | |
|---|---|---|
| Select | The "turnaround estimate" for submitting a game, having it graded and returned is 170 business days. *This service tier is noted as: "Currently paused." |
| Turbo | The "turnaround estimate" for submitting a game, having it graded and returned is 150 business days. The service tier note states: "When time is of the essence." |
| Speed Run | The "turnaround estimate" for submitting a game, having it graded and returned is 45 business days. The service tier note states: "When a collection can't live without." |
| WarpZone | The "turnaround estimate" for submitting a game, having it graded and returned is 18 business days. The service tier note states: "When you're losing sleep over it." |

https://www.watagames.com/what-we-do/pricing

28.     The "turnaround estimates" have changed several times since 2018. For example, in mid-2021, the estimated turnaround time for "Speed Run" level of service was fifteen (15) business days. At some point, it changed to thirty-five (35) business days. Now, it is forty-five (45) business days. However, Wata has consistently been unable to meet its own estimates by large margins. Wata also has changed its turnaround estimates multiple times, often after customers relied on prior time estimates stated on the company's website and made purchases based on

those representations. No price adjustments to lower service tiers were made when Wata failed to meet its own projected turnaround times.

## C.     WATA'S HISTORY WITH HERITAGE AUCTIONS AND JAMES HALPERIN.

29.     In 2018, Wata was a new company that was relatively unknown. As of April of 2018, an individual named James Halperin, who was also a co-founder of Heritage Auctions, was on the Advisory Board of Wata and was an Investor in Wata. Heritage Auctions is a large online auction house based out of Dallas, Texas. Heritage Auctions' website states that the company "is the largest collectibles auctioneer and third largest auction house in the world, as well as the largest auction house founded in the U.S." https://www.ha.com/c/about.zx?ic=footer-about-us-060716.

30.     In January of 2019, despite being a new and relatively unknown company, Wata was given an exclusive deal with Heritage Auctions wherein Heritage Auctions only offered Wata-graded video games for sale to exclusion of other grading companies. It should be noted, this appears to have changed in 2021.

31.     Heritage Auctions makes money in the role of auctioneer. Specifically, the company sells items in-person and/or online and charges the buyer a "buyer's premium" of 20% of the selling price. As such, the more an item sells for, the more Heritage Auctions makes. Heritage also takes a 5% fee from the

seller of the item, essentially ensuring the company makes money on both sides of the transaction.

32.     In February of 2019, a seller sold a sealed copy of the Nintendo Entertainment System (NES) video game Super Mario Bros for $100,000 to James Halperin (Heritage Auctions Co-Founder of Wata Advisory Board Member), Richard Lecce and Zac Gieg. Previously, the highest sale price for such a comparable video game was about $30,000. The sale was a historically high sale price for any video game at the time and was a newsworthy event.

33.     The sealed Super Mario Bros. game had previously been graded and encased in plastic by well-established video game grading company Video Game Authority (VGA), a competitor of upstart Wata. Prior to selling the game, for some unknown reason the Super Mario Bros. game had been removed from its VGA case and submitted to Wata for re-grading. Wata graded the game and gave the condition of the box a rating of 9.4, which is considered a high rating, and rated the seal as an A++ rating, which is the highest rating possible for the seal on a game. Thereafter, Wata showcased the video game publicly at retro video game events and conventions.

34.     At this time, Khan and Thrower had an interest in Wata being accepted as a legitimate video game grading company. Additionally, Khan and Thrower had an interest in seeing the value of the game rise as demand for Wata

graded games would increase along with the price the company could charge for grading services. James Halperin and Heritage Auctions also had an interest in seeing the market for retro video game prices rise as his company was an auction house that profited from the sale of retro video games graded by Wata. As buyers of the Super Mario Bros. game, Halperin, Lecce and Gieg had interests in seeing the value of their game increase.

35.     On February 14, 2019, immediately after the purchase of the Super Mario Bros. game, James Halperin touted the sale of the video game and the price in a post on Heritage Auctions' website. He also sought to increase interest in the retro video game market in general, and in the particular Super Mario Bros. game. Halperin stated the price he paid for the game, even though it was not sold through Heritage Auctions, and stated the game may appear in a future Heritage auction. Halperin would go on to market that Heritage Auctions was featuring Wata-graded video games in its "Signature Auctions," thus further increasing interest in Heritage Auctions and Wata. Heritage Auction's "Signature Auctions" are supposedly high-end, curated items that often fetch top dollar prices.

36.     The announcement also contained quotes from Chief Grader and Wata Co-Founder Kenneth Thrower claiming the game was "extremely rare" and that this particular game "may be the condition census of all sticker sealed NES games known to exist."

37.     The announcement also contained a quote from Wata President Deniz Khan which also touted the collectability of the Super Mario Bros. game. Apparently recognizing the problematic appearance of grading his own games, Khan stated: "I would have loved nothing more than to be a part-owner [of this game], and even though this game was already certified, I didn't want the remote perception of any conflict of interest due to my position at Wata." Khan went on to pump the retro video game market by stating: "While many video games sell regularly for five figures, breaking the six figure mark shows that the hobby's upward trajectory indicates no signs of slowing down." No one mentioned that Halperin was on Wata's Advisory Board.

38.     Halperin and Khan would continue to discuss the Super Mario Bros. game in other media. On February 15, 2019, online publication Ars Technica quoted Khan and Halperin when they were both pumping the sale of the Super Mario Bros. game. See https://arstechnica.com/gaming/2019/02/meet-the-man-who-got-100000-for-a-copy-of-super-mario-bros/

39.     Khan described the game as "rare" and a "holy grail." Halperin stated: "There are bets on what will someday be the first million dollar video game and many collectors believe that this will be the one." Khan confirmed: "If video games are going to go the way of comics and coins, then there will one day be a

million dollar video game sale, and I think this is that game if that's going to happen."

40.     Thereafter, Lecce appeared on Season 17, Episode 5 of the television show Pawn Stars, entitled "Pawn v. Ferrari," with the Super Mario Bros. game. The episode aired in November of 2019, although Pawn Stars is believed to be taped six (6) months in advance, meaning the events on the episode likely occurred in April of 2019. Pawn Stars is a reality show which highlights the operations of a Las Vegas pawn shop. Lecce, who also appears to have had a previous relationship with Wata, Khan and Halperin, appeared on the show claiming to want to sell the Super Mario Bros. game to the pawn shop for $1 million dollars. The proprietor of the pawn shop indicated he wanted to consult with an expert to value the game. The expert brought on the show was none other than Deniz Khan. During the episode, however, Lecce and Khan failed to identify any kind of relationship to one another. Rather, they appeared to pretend they did not know each other.

41.     Khan then stated that he remembered the game coming through Wata and described it as the "most significant piece of video game history" that has ever passed through the grading company. Khan failed to note that Wata had only been in existence only a few years and had been grading games for even less time. It should be noted that since this time, there have been more than 182 copies of the

same Super Mario Bros game graded by Wata, bringing claims about its rarity into question.

42.    The pawn shop owner asked Kahn what the game would bring if it came up for auction. Khan responded by again pumping the history and importance of the game. He claimed: "I know of firm offers that have been turned down at $300,000. It goes up from there. There is no ceiling really." Khan failed to explain how he had knowledge of these supposed other offers if he was not in contact with the owners or why he would be sharing such information if he were completely removed from the transaction. The game that had been sold just nine (9) months earlier for $100,000 had just been publicly valued by Khan to have more than tripled in value over the price for which it just sold, without any kind of disclosure that the person making the valuation was an interested business partner of the game's owners.

43.    Tellingly, no deal to purchase the game was made by the pawn shop. However, the visibility and alleged value of the game had been successfully inflated to the public. The episode has since removed from History Channel's website without explanation.

### D.    RETRO VIDEO GAME PRICES SURGED AND DEMAND FOR GRADING SERVICES INCREASED.

44.     The retro video game market responded to situation by running up the price of the Super Mario Bros. game and game in general. For example, in April of 2020, which was about five (5) months after the airing of the Pawn Stars episode, another copy of Super Mario Bros. was purchased by fractional ownership investment company Rally for $140,000. This particular game would go on to be sold in August of 2021 for $2 million dollars to an unnamed buyer.

45.     In July of 2020, Heritage Auctions hosted an auction of an arguably less valuable variant of the Super Mario Bros. game graded by Wata for $114,000.

46.     In April of 2021, another copy of the same game sold through Heritage Auctions for $660,000. With a 20% buyer premium being paid to Heritage Auctions, Halperin's company benefitted from the sales by about $154,800.

47.     The ongoing sales of Wata-graded games through Heritage Auctions were again newsworthy events in the video game collecting community. Heritage Auction's sales continued to cause a frantic surge in prices. At the time, there were no population reports available to the public noting how many copies of particular games had been graded. As such, collectors had no idea how many sealed Super Mario Bros. games really existed, but some collectors presumed the game to be very rare given the comments of Khan and Halperin.

48.     Across the board, prices skyrocketed. There was significant interest in collecting video games. This interest corresponded to even more demand for Wata-graded video games since the high prices commanded for the aforementioned games were largely sealed games that had been graded by Wata with Heritage Auctions routinely facilitating the transactions.

49.     Heritage Auctions benefitted by earning more commissions from sellers and buyers. Halperin benefitted from the value of his game increasing.

50.     Wata benefitted by the increased notoriety and increased demand for grading services. Also, the increased value of the games allowed Wata to charge even more for its grading services since prices were tied to values. Yet, the relationship between Wata and Heritage Auctions was still unknown to collectors.

53.     Meanwhile, video game collectors rushed to send in their own sealed games into Wata for grading, believing they could sell the games for profits as the market soared. Unbeknownst to collectors, Wata was massively bogged down by the rush. Still the company advertised false and overly optimistic turnaround times on its website. Customers were not notified of the delays in advance of their purchases. Wata continued accepting orders and payments from customers.

**E.     WATA'S UNFAIR PRACTICES AND THE PUBLIC DISCLOSURE OF THE RELATIONSHIP OF BETWEEN WATA, HERITAGE, KHAN AND HALPERIN.**

52.     In or about July of 2021, California headquartered CU purchased Wata. Meanwhile, Heritage Auctions was holding "Video Game Signature Auctions," which prominently featured Wata-graded games.

54.     On or about August 23, 2021, an independent journalist named Karl Jobst released a YouTube video called "Exposing FRAUD And DECEPTION in the Retro Video Game Market" which highlighted many of the problems and misstates by Wata and Halperin's association with the company. Also in August of 2021, journalist, attorney, and video game collector Seth Abramson wrote online articles also detailing many of the false statements and unfair business practices detailed herein.

55.     The release of the Jobst YouTube video and the Abramson article caused waves in the video game collecting community. Wata customers became very nervous and were unsure what the impact of the revelations would have on the collectors' market. Understandably, collectors wanted to get their property back from Wata.

56.     After the disclosures by independent journalists, prices for retro video games began falling. For example, on July 11, 2021, which was before the aforementioned disclosures by independent journalists, a "Super Mario 64" game that was graded by Wata as 9.8 A++ sold for $1.56 million dollars through Heritage Auctions. On October 29, 2021, after the disclosures, a copy of the same

title graded by Wata at 9.6 A++ sold for $102,000 through Heritage Auctions. On April 22, 2022, Heritage Auctions sold a Super Mario 64 game graded by Wata at 9.6 A++ for $57,600.

57.     Meanwhile, Wata still failed to advise customers of the delays it was experiencing. When customers inquired why their games were being held for months longer than anticipated, Wata responded with a variety of excuses claiming they were lacking packaging or that they had a "bottleneck" at the encapsulation stage. Delays extended months passed turnaround expectations.

## F.     WATA'S RELOCATION TO CALIFORNIA.

58.     In September of 2021, Wata announced it was relocating its services to Santa Ana, California where the new parent company CU was located.

59.     Some collectors still had games being held by Wata in Colorado. Somehow, Wata moved or shipped many of the games in its possession to California without requesting permission from game owners or otherwise informing the collectors of security protocols being used to transport their valuable property.

60.     It is currently unknown how Wata shipped these valuable items. However, prior to the relocation, Wata made representations to collectors about games being maintained in secure facility. Collectors did not anticipate or consent

to having their items valuable items shipped across the United States without security assurances.

61.     By January of 2022, the majority of Wata operations were being conducted at the Santa Ana, California facilities of CU.

62.     As of the filing of this complaint, many collectors still have not received their games and Wata has been holding their games for months past the estimated turnaround times.

## G.     OTHER SELF-DEALING BY WATA AND ITS AFFILIATES.

63.     While Wata was undergoing the CU purchase, independent journalists and collectors raised even more concerns about Wata's unfair and misleading business practices. Specifically, collectors learned that Wata was allowing its own employees, directors, investors and affiliates to sell Wata-graded games without disclosing such relationships. Additionally, Wata gave the collection of at least one of its own directors a special name and special badging notations on Wata-graded games without disclosing the business relationship.

64.     Dain Anderson was involved with Wata in the early days. He is listed as an Executive Officer of the company in SEC filings from 2017. Anderson had a large video game collection which contained many games graded by VGA, Wata's major competitor. Anderson left the company at some point in 2017 or 2018.

65.     In or around July of 2018, Jeff Meyer was listed in SEC filings as Director of Wata. He has also identified himself as an Investor in Wata.

66.     In or around May of 2019, while Jeff Meyer was affiliated with Wata, he claims to have purchased Dain Anderson's video game collection. Meyer broke open at least some of the VGA encapsulations and had games re-graded by Wata. Wata went to the trouble of naming the collection "the Carolina Collection" and gave the games a special designation on the encapsulation, presenting the items as somehow more valuable than other games due to their alleged "pedigree." See https://www.watagames.com/learn/blog/post/the-carolina-collection/

67.     On July 1, 2019, Wata President Khan posted about the "Carolina Collection" on Wata's website, specifically noting the impressive nature of the games, again boosting the perceived value of the games among collectors. The post about the "Carolina Collection" identified both Dain Anderson as the seller and Jeff Meyer as the buyer, but Wata did not disclose either of their affiliations with the company. Rather, Wata appeared to try to give the impression that neither individual had any affiliation with Wata. Dain Anderson was noted as running a website called "NintendoAge." His prior affiliation with Wata was not disclosed. Jeff Meyer was noted as "living in neighboring cities" with Dain Anderson and being a "founder of GoCollect.com (a leader in valuation and collecting tools for comic books) and a seasoned investor in golden age comics." There is no notation

that Jeff Meyer was a current Director of Wata or an Investor in the company. Rather, by noting the locations of Anderson and Meyer, Wata created the perception that the buyer and seller connected because of their geographic proximity.

68.     Some of the so-called "Carolina Collection" were sold at very high prices through Heritage Auctions and at least one other auction site. Jeff Meyer likely profited directly from the sales of the games. Wata's profile also increased due to apparent objective grading of "pedigreed" items from a supposedly special collection. Heritage Auctions again profited from sales as the auctioneer.

69.     In addition to these events, in September of 2021, in one of Seth Abramson articles, it was revealed that he had unwittingly purchased Wata-graded video games from Mark Haspel, who is identified in July 2018 Wata SEC filings as a "Promoter" of the company. At the time, Mark Haspel had multiple listings of Wata-graded games up for private sales. Again, no disclosure was made that he was a person affiliated with Wata or that he was selling games of which he may have had influence over the grading process.

70.     Despite public proclamations otherwise, Wata and its director, investors, employees and founders did not refrain from conflicts of interests and, instead, acted to enrich themselves by using their unique position as a video game

grading company to inflate the retro video game market to increase personal and business profits.

## V.      ALLEGATIONS RELATING TO THE PLAINTIFFS.

71.     Plaintiffs all have standing to maintain claims because they all went to Wata's website, reviewed the representations of Wata, and ordered video game grading services based the company's representations about turnaround times. None of the Plaintiffs received their graded games within the turnaround window quoted by Wata or within a reasonable time thereafter. As such, all plaintiffs have been damaged in that they paid for video game grading services to occur in a particular time frame which was not met by Wata. Market conditions have considerably cooled in the meantime and game values have dropped across the board. As such, the price to grade such games has also dropped based on Wata's pricing model, but no adjustments were made for customers.

### A.      PLAINTIFF JACOB KNIGHT

72.     Jacob Knight is a video game collector from California.

73.     On June 8, 2020, Knight placed Order No. 575734 with Wata.  His order requested grading services for three (3) games. He ordered the "Select" service level which called for one hundred eighty (180) business day estimated turnaround time.

74.    Knight promptly shipped his games to Wata's Colorado facility. It is estimated that Wata received his games on or about June 15, 2020.

75.    One hundred eighty (180) business days from the estimated date of Wata's receipt of the games at the Colorado facility fell on March 9, 2021. March 9, 2021 came and passed but Knight did not receive his games back.

76.    On March 3, 2022, almost a year after he expected to receive his games back, Knight received notice that his games had finally shipped. In all, nearly twenty-one (21) months passed from the time of order until the time that Knight received his graded games.

**B.    PLAINTIFF JACK CRIBBS**

77.    Jack Cribbs is a video game collector from Michigan.

78.    On April 7, 2021, Cribbs placed Order No. 580337 online through Wata's website for grading of two (2) games. He selected the "Speed Run" service tier which is believed to have called for a turnaround time of fifteen (15) business days. The games were shipped to Wata immediately and are estimated to have been received by Wata at their Colorado facility on or about April 12, 2021.

79.    Fifteen (15) business days from estimated date of receipt of the shipment to Wata's Colorado facility was May 3, 2021.  May 3, 2021 came and went without Cribbs receiving his games back.

80.     On May 27, 2021, Cribbs sent an e-mail to Wata requesting a status update.

81.     On May 31, 2021, Wata responded by way of e-mail stating the company had changed the turnaround time to thirty-five (35) business days.  This change was apparently made after Cribbs placed his order and was not communicated to him. Thirty-five (35) business days from estimated date of Wata's receipt of the games would have been June 1, 2021.

82.     On June 13, 2021, Cribbs again sent an e-mail requesting a status update.

83.     On June 15, 2021, Wata responded with an e-mail apologizing for delays.

84.     On June 28, 2021, Cribbs again sent an e-mail requesting a status update.

85.     On July 1, 2021, Wata responded stating that it would take "15 days for labeling and encapsulation."

86.     On July 18, 2021, Cribbs sent another e-mail requesting a status update.

87.     On July 23, 2021, fifteen (15) business days from the July 1, 2021 Wata e-mail passed. Cribbs still did not receive his games.

88.     On August 18, 2021, Wata responded to Cribbs July 18, 2021 e-mail claiming that there were problems with DVD style cases.

89.     On September 1, 2021, Cribbs again sent an e-mail asking for a status update.

90.     On September 28, 2021, Wata sent an e-mail response indicating the company missed its September 8, 2021 "goal" to have games out.

91.     On October 16, 2021, Cribbs sent another request for a status update.

92.     On October 29, 2021, Wata sent an e-mail response about Cribbs games being in "post grading."

93.     On November 3, 2021, Cribbs received a shipping message received from Fed Ex.

94.     On November 6, 2021, Cribbs received delivery of his games.

95.     Cribbs ordered a video game grading service that was supposed to take fifteen (15) business days. In total, seven (7) months elapsed, or one hundred forty-five (145) business days before Cribbs received his games.

**C.      PLAINTIFF JASON DOHSE**

96.     Jason Dohse is a video game collector from Iowa.

97.     On December 4, 2021, Dohse placed Order 587652 with Wata. His order requested grading services for five (5) games. He ordered the "Speed Run"

level service which had an estimated turnaround time of either thirty-five (35) or forty-five (45) business days.

98.   Dohse promptly shipped the games to Wata. The games are estimated to have been received by Wata on or about December 8, 2021.

99.   Forty-five (45) business days from December 8, 2021 fell on February 14, 2022.

100.   On February 7, 2022, Dohse sent an e-mail to Wata requesting a status update.

101.   On February 9, 2022, Wata responded to Dohse and informed him that the company was "running behind on our business day estimates."

102.   February 14, 2022 came and went without Dohse receiving his games.

103.   On March 2, 2022, Dohse sent another e-mail request to Wata asking for a status update. There was no response.

104.   On March 14, 2022, Dohse sent another e-mail request to Wata again asking for a status update.

105.   On March 15, 2022, Wata responded to Dohse's with a generic e-mail that offered little usable information and no estimates of when his games would be returned. The Wata e-mail indicated Dohse's games were still in "post-grading" where "Speedrun orders spend the bulk of their processing time." The e-mail also noted that services "will require additional time."

106.   By this point, Dohse was concerned about the delays and upset by the generic response. He wrote another e-mail to Wata that stated, in part: "Is there an issue with your staffing, material needed to encapsulate my games?? I sent them to your company with confidence to perform a service and I paid upfront. **I don't need my games tomorrow I just want an update that is real**." (Emphasis in original.)

107.   Wata responded the same day with an apology and a notation that the estimate for Speed Run orders has been pushed to 75+ business days.

108.   Dohse responded again with his own e-mail. It states, in part: "*Please be more transparent*: If the "speedrun" service is now 75+ days have the team update your website to reflect that immediately. It's one of the easiest coding changes, literally just change the 4 to a 7 whatever number is accurate. [Original paragraphing not followed.] This appears to have been a problem long before I placed my last order. I know this because I fell in a dark hole of google/forum searching recently and there is a really bad set of stories on the length of time folks have been taking to get games for over a year+ now with people waiting 7-9 months for speedrun orders. Its cruel and stressful for the people that put their trust in your company to deliver a service. **The community is not mad they are in fact outraged (just read the BBB reviews)**[.] (Emphasis in original.)

109.   On March 30, 2022, Dohse was notified his games had been shipped back to him from Wata's California facility.

110.   Dohse paid for grading services in forty-five (45) business days but Wata took seventy-six (76) business days to provide the service bargained for and then only returned the games after Dohse sent frustrated e-mails.

## VI.   CLASS ALLEGATIONS.

111.   Plaintiffs bring this action on their own behalf and pursuant to Federal Rule of Civil Procedure 23(a) & (b), on behalf of the following class ("the class").

112.   The class is initially defined as follows:

> The proposed class includes all individuals in the United
> States who directly purchased encapsulation and video
> game grading services from Wata, Inc. from May 10,
> 2019 who did not have their orders returned within the
> turnaround times estimated by Wata, Inc. on the
> company's website.

113.   Plaintiffs reserve the right to amend the definition of the class if discovery, investigation or further information or rulings by the Court indicate that modification is appropriate.

114.   The "class period" means the three (3) years preceding the filing of the Complaint in this action.

## A.  ASCERTAINABILITY.

115.   The members of the class are readily ascertainable from Defendants'
business records of customers who ordered grading services over the class period.
Additionally, Defendants' business records will evidence advertised turnaround
times, actual turnaround times, shipping date information and the services tiers
ordered by customers. As such, class members and claims can be ascertained by
reference to Defendants' business records.

## B.  NUMEROSITY - Fed. R. Civ. P. 23(a)(1).

116.   The members of the class are so numerous that the joinder of all
members of the class in a single action is impractical. The exact number of class
members is unknown at this time. Wata has released "population reports" of
particular categories of video games that have been graded by the company. For
example, a population report of "sealed" Nintendo Entertainment Systems (NES)
games graded by the company indicates that thousands of games have been graded.
This "population report" was published on the Wata website. See
(https://www.watagames.com/populations/nes/). As of April 13, 2022, there are
more than 9,000 entries on this one report. This population one report does not
account for all other games submitted for grading on other systems, such as the
multitude of other Nintendo systems, Atari systems, Playstation systems, Xbox
systems, Sega systems, or CIB or Loose games. Even assuming consumers sent in

an average of two (2) games per order, there will likely be in excess of 4,000 class members sending in just sealed NES games. Extrapolating estimates across all consoles and categories of games, it is likely that the class size exceeds 10,000 individuals.

## C.   COMMONALITY AND PREDOMINANCE –
## Fed. R. Civ. P. 23(a)(2) and (b)(3).

117.   There are questions of law and fact common to the class members. These common questions of law and fact include, without limitation:

(a)   Whether Wata and CU engaged in a course of conduct designed to artificially inflate the retro video game market in order to enhance their own profits;

(b)   Whether Wata and CU's conduct actually inflated the retro video game market;

(c)   Whether Wata and CU charged customers for grading services based on artificially high market prices;

(d)   Whether Wata and CU falsely advertised unrealistic turnaround times to the public;

(e)   Whether Wata and CU charged consumers for expedited services knowing that paying for expedited services would not ensure the consumer received their games in a timely manner;

(f)     Whether Wata and CU became aware that their turnaround times were unattainable yet still failed to disclose the true turnaround times to consumers; and

(g)     Whether Wata and CU failed to correct their own misstatements to customers.

## D.     TYPICALITY - Fed. R. Civ. P. 23(a)(3).

118.    Plaintiffs' claims are typical of other class members because Plaintiffs all engaged with Wata based on the company's standardized business model that had customers from around the United States purchasing services through Wata's website. As noted, Wata maintained a website where customers input information to place an order and select a service tier. Games were then shipped to Wata at either its Colorado or California facility. The games were held and graded by Wata and then returned to the customer from either its Colorado or its California facilities. Each of the plaintiffs, like other members of the class, did not receive what they bargained for in that pricing for services were based on artificially inflated value due to market manipulation by Wata and Wata accepted orders knowing their estimated turnaround times could not possibly be met.

## E.     ADEQUACY OF REPRESENTATION - Fed. R. Civ. P. 23(a)(4).

119.    Plaintiffs will fairly and adequately represent and protect the interests of the class members. Plaintiffs have retained competent counsel experienced in

litigation of class actions, including consumer protection actions. Plaintiffs' claims are typical of the claims of other class members, and Plaintiffs have the same non-conflicting interests as the other class members. Therefore, the interests of the class members will be fairly and adequately represented by Plaintiffs and their counsel.

## F.    SUPERIORITY OF CLASS ACTION - Fed. R. Civ. P. 23(b)(3).

120.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There is not anticipated to be any difficulty in the management of this action as a class action and, rather, the disposition of the claims of the class members in a single action will provide substantial benefits to the parties and to the Court. Damages for any individual class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied.

121.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class, such that final injunctive relief and/or corresponding declaratory relief is appropriate to the class as a whole. For example, Defendants maintain unattainable turnaround times on its website. Defendants failed, and

continue to fail, to properly notify customers and consumers of delays. Unless the class is certified, Defendants will carry on with these unlawful practices and harm to consumers will continue.

## FIRST CAUSE OF ACTION - 18 U.S.C. § 1962(c) (RICO)

(By All Plaintiffs as to All Defendants)

122.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

123.   <u>Culpable Person</u>. Wata, Deniz Khan, Kenneth Thrower, Heritage Auctions, and James Halperin are culpable persons pursuant to 18 U.S.C. §1961(3). Each culpable person was an entity capable of holding a legal or beneficial interest in property.

124.   <u>The Enterprise.</u> Together, Wata, Khan, Thrower, Heritage Auctions and Halperin constituted an "enterprise" as defined by 18 U.S.C. § 1961(4) in that they were an association, in fact, of entities engaged in, and the activities of which affected, interstate and foreign commerce ("the enterprise").

125.   The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of running up the prices of retro video games to increase the value of their own collections and business interests, to increase prices for grading services of Wata and to increase sales and auction fees for Heritage Auctions.

126.   <u>Predicate Acts.</u> Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme.

127.   Those acts include, but are not limited to, the following: 1) The February of 2019 purchase of the Super Mario Bros. game at an inflated price by Halperin and others; 2) The February of 2019 public statements of Halperin disclosing the sale of the Super Mario Bros. game and sale price on the Heritage Auction website without disclosing his relationship to Wata; 3) Khan's public comments in the February of 2019 Heritage Auction website posting by Halperin that stated, in part: "I would have loved nothing more than to be a part-owner [of this game], and even though this game was already certified, I didn't want the remote perception of any conflict of interest due to my position at Wata" without disclosing Halperin's relationship to Wata; 4) The appearance of Lecce and Khan on History Channel's "Pawn Stars" show and the nondisclosure of an existing relationship between the two; 5) Statements made by Khan to Ars Technica pumping up the value of the Super Mario Bros. game and the market in general; 5) Khan's valuation of the Super Mario Bros. game as potentially being worth $1 million dollars or more on the Pawn Star episode despite no such comparable sales

existing and the game having just been purchased by the seller for a substantially lower price; 7) Heritage Auctions selling and offering for auction almost exclusively Wata-graded games for immense profits to the exclusion of other grading companies; 8) Wata accepting payments from customers for grading services it could not deliver in a reasonable period of time without disclosing its backlog and delays; 9) Wata's directors and employees selling games without disclosing their relationship to the company after Khan indicated such a practices was not permitted; and 10) Wata giving preferential treatment to its affiliates, including Meyer, by naming his collection ("the Carolina Collection") and placing special designations on the encapsulation without properly disclosing the business relationship between Meyer and Wata.

128.   In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. §2. As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343 on this additional basis.

129.   <u>Violations of 18 U.S.C. §§ 1341 and 1343.</u> In furtherance of the illegal goals of the enterprise, Wata, Khan, Thrower, Halperin and Heritage Auctions conspired among themselves and with other individuals to violate 18 U.S.C. section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering

activity, as defined in 18 U.S.C. sections 1961, 1962, and 1964; consisting of multiple illegal acts indictable under 18 U.S.C. sec. 1341 (relating to mail fraud), 18 U.S.C. secs. 1341 and 1346 (relating to honest services mail fraud), 18 U.S.C. sec. 1343 (relating to wire fraud); and 18 U.S.C. secs. 1343 and 1346 (relating to honest services wire fraud).

130.   For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of market manipulation, false representations and/or material omissions, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories materials and things to be sent or delivered by the United States Postal Service or other commercial interstate carriers, and received materials and things from the United States Postal Service or other commercial interstate carriers, including but not limited to video games, graded video games and related correspondence.

131.   For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of market manipulation and/or false representations and material omissions, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, by use of the internet, and by use of online technology, matter including but not limited to false representations about turnaround times and monetary payments including credit card payments from consumers for video game grading services.

132.   Defendants either knew or recklessly disregarded the fact that their misrepresentations and omissions, as described more fully herein, were material and Plaintiffs and class members relied on those misrepresentations and omissions.

133.   Defendants have wrongfully obtained money and payments by Plaintiffs and class members. Plaintiffs and the class have been injured by the acts of mail and wire fraud and by Defendants aiding and abetting each other's acts of mail and wire fraud.

134.   <u>Pattern of Racketeering Activity</u>:  The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In addition to the acts described more fully herein which related to inflating the retro video game market, Defendants have also committed or aided and abetted in the commission of thousands of acts of racketeering activity by accepting payment for video game grading services which were based on false representations of turnaround times, nondisclosure of material facts, and charging consumers for grading services based on artificially inflated valuation of video games. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of

commission, had similar results and impacted similar victims, including Plaintiffs and class members.

136.   The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

137.   <u>Injury to Plaintiffs</u>. Each of the Plaintiffs herein, and all class members, have standing to bring a claim under civil RICO because each of them has suffered a concrete and distinct injury–that being, at a minimum, the payment of fee for grading services which were not timely provided. These injuries to business or property stemmed from the predicate acts of the enterprise.

138.   Additionally, Plaintiffs and class members also suffered financial losses when the value of graded games declined after suspect activities were reported upon by independent journalists.  Plaintiffs and class members fees for grading services were based in part on the supposed value of the game being graded. As such, Plaintiffs paid inflated fees for grading services because of the predicate acts. Wata retained video games submitted by collectors for far longer time periods than advertised, depriving customers of the opportunity to participate in the market.

139.   As a direct and proximate cause of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), Plaintiffs have been injured in their business and property as noted more fully herein.

140.   Accordingly, Plaintiffs, on behalf of themselves and class members, brings this cause of action under 18 U.S.C. sec. 1964(c) which provides: "Any person injured in his business or property by reason of violation of section 1962 of this chapter may sue therefor in an appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suite, including a reasonable attorney's fee. . ."

## SECOND CAUSE OF ACTION - Cal. Bus. & Prof. Code §§17200, et seq.

(By Plaintiffs Against All Defendants)

141.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

142.   Plaintiffs and Defendant are each "person(s)" as that term is defined by California Business & Professions Code section 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

143.   California Business & Professions Code § 17204, a provision of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200–17209), confers

standing to prosecute actions for relief on private individuals, i.e., "any person acting for the interests of itself, its members or the general public."

144.   Thus, private Plaintiffs who have suffered a financial injury may sue to obtain relief for others.

145.   "Unfair competition" is defined by California Business & Professions Code section 17200 as encompassing several types of business "wrongs," including: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in section 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

146.   By knowingly and intentionally engaging in the activities described herein, such as making false representations about the expected turnaround times for video game grading services, Defendants have acted unfairly, unconscionably and unreasonably and repeatedly engaged in unlawful business practices.

147.   Defendants' actions and representations constitute "unfair, unlawful or fraudulent" business act or practice under California Business & Professions Code section 17200 in that Defendant's conduct is substantially injurious to consumers, violates California statutory protections, and is unethical and unscrupulous. Defendants' conduct has caused and continues to cause Plaintiffs

and the class members to purchases services which they have not timely received and to pay increased prices for elevated service levels that are not met.

148.   At a date presently unknown to Plaintiff, but in the four years prior to the filing of this action, and as set forth above, Defendant committed acts of "unfair competition" as defined by California Business & Professions Code §§ 17200 as described more fully herein.

149.   Plaintiffs and members of the Class suffered injury when they relied on the false representations made by Defendants and purchased grading services and products from Defendants.

150.   Defendants have a financial incentive to continue engaging in false advertising and unfair business practices because they continue to profit from the conduct. Thus, intervention is necessary to stop the conduct.

### THIRD CAUSE OF ACTION - Cal. Bus. & Prof. Code §17500

(By Plaintiffs Against All Defendants)

151.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

152.   Defendants have violated California's prohibition against false advertising under California's Business & Professions Code section 17500 by knowingly and intentionally stating processing times it could not meet and accepting orders for grading services without notifying consumers of the true wait

times for services, Defendants have routinely engaged in this unlawful business practices.

153.   Defendants' statements in its online advertising were, and are, untrue and/or misleading.

154.   Defendants knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading.

155.   Plaintiffs and class members were deceived by the false advertising claims of Defendants. Reasonable consumers will continue to be deceived by such representations.

**FOURTH CAUSE OF ACTION - Intentional Misrepresentation**

(By Plaintiffs Against All Defendants)

156.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

157.   Defendants made false representations of fact by stating inaccurate turnaround times.

158.   The turnaround times were material to consumers deciding to purchase grading services.

159.   At the time of the representations, Defendants knew the representations were false. Defendants knew turnaround times were unrealistic and processing of orders was taking substantially longer than estimates.

160.   Defendants carried on making further false representations to complaining customers by maintaining a website with materially false estimated turnaround times and, when customers complained, Defendants stated unrealistic "revised" turnaround times.

161.   Defendants made the false representations with the intent that Plaintiffs and class members would rely on the statements when making the decision to order grading services. Defendants made the statements to induce consumers to pay for services.

162.   Plaintiffs and class members actually and justifiably relied on the false statements when making the decision to order grading services.

163.   Plaintiffs and class members would not have purchased grading services at all and/or would not have purchased elevated tiers of service had they know the true state of the turnaround times.

164.   Plaintiffs and class members actually and suffered damages as a result of Defendants conduct. Specifically, Plaintiffs and class members paid money for services they did not timely receive. Plaintiffs also paid higher fees based on Defendants making false representations about the state of the market, driving up prices which was a component of the prices charged to consumers.

### FIFTH CAUSE OF ACTION - Nondisclosure

(By Plaintiffs Against All Defendants)

165.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

166.   Defendants had a duty to be honest with consumers purchasing grading services. Defendants had a duty not create unrealistic expectations by making inaccurate statements. Defendants had a duty to customers to correct inaccurate statements made on its website.

167.   Defendants concealed the fact that it could not meet its own deadlines. Defendants failed to advise customers of delays. Defendant failed to correct time estimates on its website and failed to notify customers of true estimates.

168.   Turnaround times were material to Plaintiffs, class members and consumers in deciding to purchase services.

169.   Defendants failed to disclose the true turnaround times and failed to disclose delays with the intent of creating false impressions in the minds of Plaintiffs and class members.

170.   Defendants failed to disclose and concealed the true facts with the intent that Plaintiffs and class members purchase grading services even though such purchases would not have been made had Plaintiffs and class members known the truth about processing times.

171.   Plaintiffs and class members made purchases for services after relying on the assumption that the concealed and undisclosed facts either did not exist or that Defendants would comply with their own representations.

172.   Plaintiffs and class members actually and justifiably relied on Defendants misrepresentations and the failure to disclose the true facts.

173.   Plaintiffs and class members reliance caused damages and losses to Plaintiffs and class members.

### SIXTH CAUSE OF ACTION – Cal. Civ. Code §1750 et seq.

(By Plaintiffs Against All Defendants)

174.   Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

175.   California Civil Code section 1750, entitled Consumers Legal Remedies Act ("CLRA") delineates unfair or deceptive practices in a transaction relating to the sale of goods or services to a consumer.

176.   Defendants sold goods and services. Defendants sold "goods" in the form of "encapsulation" products.  Defendants sold "services" in the form of video game grading services.

177.   Plaintiffs and class members were "consumers" in that they were the purchasers of Defendants goods and services.

178.   By sending in video games for grading and encapsulation, Plaintiffs and class members conducted a "transaction" with Defendants.

179.   Defendants violated Civil Code section 1770 by advertising goods or services with intent not to sell them as advertised and/or advertising goods or services with intent not to supply reasonably expectable demand. (Civ. Code § 1770(a)(9) & (10).)

180.   These acts were done knowingly by Defendants as Defendants were uniquely aware of their own inability to meet demand and the inaccuracy of their own turnaround time estimates. Nevertheless, Defendants chose to continue stating unrealistic turnaround times on their website, making unrealistic revisions of turnaround times to customers and collecting payments for goods and services.

181.   As a direct and proximate result of Defendants' conduct in violating the CLRA, Plaintiffs and class members seek injunctive relief prohibiting such conduct in the future and requiring Defendants to state accurate turnaround times on their website.

182.   California Civil Code section 1780 provides that if a Defendant engages in a practice declared deceptive under the Act, Plaintiffs may file a complaint for damages:

(a) Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be

unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following:

>    (1)  Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).

>    (2)  An order enjoining the methods, acts, or practices.

>    (3)  Restitution of property.

>    (4)  Punitive damages.

>    (5)  Any other relief that the court deems proper.

183.   California Civil Code section 1780, subsection (e) also allows a prevailing plaintiff to recover costs and attorney's fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

AS TO THE CLASS ACTION ALLEGATIONS:

That this action be certified as a Class Action, that Named Plaintiffs be appointed as Class Representatives and that Plaintiffs' Counsel be appointed Class Counsel.

AS TO THE FIRST CAUSE OF ACTION (RICO):

Plaintiffs request for judgment in their favor on the First Cause of Action of the Complaint against Defendants Wata and CU, for compensatory damages in an amount which is fair and reasonable to compensate the class members for their

damages, including at least a partial recoupment of fees paid to Defendants during the applicable statute of limitations period, for treble damages, costs of suit and reasonable attorney's fees.

AS TO THE SECOND AND THIRD CAUSES OF ACTION (CAL. BUS. & PROF. CODE §§17200 & 17500):

Plaintiffs seek public injunctive relief to benefit the general public directly by bringing an end to Defendants unfair business practices which threaten future injury to the public. Specifically, Plaintiffs seek an injunction requiring Defendants to immediately cease making false statements about expected turnaround times for grading services. Plaintiffs also seek restitution measured by the difference between the price paid for services and the value of the services received. Plaintiffs also request attorney's fees and costs pursuant to California Code of Civil Procedure section 1021.5.

AS TO THE FOURTH AND FIFTH CAUSES OF ACTION (INTENTIONAL MISREPRESENTATION AND NONDISCLSOURE):

Plaintiffs and class members seek monetary damages in the form of a refund of fees paid measured by the difference between the price paid for services and the value of services actually received. Plaintiffs and class members also request the imposition of punitive damages.

AS TO THE SIXTH CAUSE OF ACTION (CAL. CIV. CODE §1770):

Plaintiffs seek public injunctive relief to benefit the general public directly by bringing an end to Defendants unfair business practices which threaten future injury to the general public. Specifically, Plaintiffs seek an injunction requiring Defendants to immediately cease making false statements about expected turnaround times for grading services.

Plaintiffs also pray for judgment finding Defendants practices are deceptive and seek compensatory damages in an amount which is fair and reasonable, for punitive damages in an amount sufficient to punish Defendants and deter future conduct, for reasonable attorney's fees and costs and such other relief and the Court deems proper.

Dated:      June 9, 2022            LAW OFFICES OF JANEEN CARLBERG


*/s/ Janeen Carlberg* (SBN 189197)
JANEEN CARLBERG
Attorney for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Pursuant to the Seventh Amendment of the Constitution of the United States of American and Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of all others similarly situated, are entitled to, and demand a trial by jury on all issues triable by a jury.

Dated:        May 10, 2022            LAW OFFICES OF JANEEN CARLBERG

                                      _/s/ Janeen Carlberg_ (SBN 189197)
                                      JANEEN CARLBERG
                                      Attorney for Plaintiffs

## VENUE AFFIDAVIT OF JANEEN CARLBERG

I, Janeen Carlberg, am an attorney at law, duly licensed to practice and admitted before all the Courts of the State of California and the United States Central District. I am the attorney of record in the matter of Knight, et al. v. Wata, Inc., et al. I am familiar with the facts stated herein and, if called to testify, I could and would competently testify thereto.

1.     I have conducted independent investigations on this matter.

2.     This Declaration is made in support of Plaintiffs' Venue Affidavit pursuant to California Civil Code section 1780(d).

3.     Venue is proper in the County of Orange, or Southern Division of the Central District of California, because Plaintiff's claims arise out of the business activities of Defendant, some of which were conducted in the State of California. Also, from the time Wata, Inc. began offering game grading services to the public until the present, Wata has maintained a website accessible to California consumers, solicited customers in the State of California, has entered into business transactions with California consumers, performed services for California consumers, shipped items to California consumers.

4.     Additionally, in 2021 Collector's Universe, a company with its principal place of business in Santa Ana, California, purchased Wata, Inc. In 2021, Wata, Inc's operations began to be relocated to Santa Ana, California. By the

beginning of 2022, both Wata, Inc. and Collector's Universe were both residing and operating in Santa Ana, California.

5.      According to the California Secretary of State's website as of May 10, 2022, Collector's Universe, Inc. is a Delaware corporation with its principal place of business located at 1610 East Saint Andrew Place, Suite 150, Santa Ana, CA 92705.

6.      According to the California Secretary of State's website as of May 10, 2022, "Wata, Inc." has not corporate documents on file.  However, in September of 2021, Wata, Inc. announced it was relocating to Santa Ana, California. Currently, Wata, Inc.'s publicly accessible website reflects a business address of "1610 E St. Andrew Pl. STE 150, Santa Ana, CA 92705."

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge, information and belief.

Executed this 10th day of May of 2022 at Santa Ana, California.


*/s/ Janeen Carlberg*
Janeen Carlberg, Declarant